[No. 5275.   Decided March 4, 1905.]

CHARLES H. DIXON, *a Minor, by M. G. Royal, his Guardian ad Litem, Respondent,* v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*[1]

RAILROADS — BRAKEMEN — AUTHORITY — WANTON EJECTION OF TRESPASSER.  A brakeman on a freight train acts within the scope of his authority in ejecting trespassers from the cars, and the company is liable for injuries resulting from the wanton and wilful act of the brakeman in so doing in an improper manner while the train is in motion, without evidence showing the brakeman's authority.

SAME—EVIDENCE—RES GESTAE.  Where a trespasser, a boy, was wrongfully ejected from a train while in motion, his arm being crushed under the wheels, his statement, upon being discovered five minutes thereafter, in great pain and crying, that the brakeman kicked him off the train, is admissible as part of the *res gestae*.

[1]Reported in 79 Pac. 943.

Mar. 1905.]          Opinion Per DUNBAR, J.

SAME—HEARSAY EVIDENCE.  In such a case the statement of a stranger who witnessed the accident, made to the witness, is not admissible as part of the *res gestae*, being hearsay.

Appeal from a judgment of the superior court for Thurston county, Linn, J., entered February 29, 1904, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained in being ejected from a moving train.   Affirmed.

*B. S. Grosscup* and *A. G. Avery,* for appellant.

*Troy & Falknor,* for respondent.

DUNBAR, J.—This action was brought in behalf of one Dixon, to recover damages for the alleged wanton and wilful act of a brakeman in kicking him from a moving train, resulting in injuries necessitating the amputation of his arm.  Dixon was a boy about eighteen years old, and was beating his way on a freight train from Portland to Tacoma, riding on the bumpers six or seven cars back from the engine.  The train reached Centralia about two o'clock in the  morning of July 3, 1903, stopped a few minutes, and then pulled out.  After going two or three hundred yards from the depot, a brakeman came over the cars, and asked Dixon if he had any money, and, being told that he had none, swore at him and told him to get off.  He answered that the train was going too fast, and he could not get off, and the brakeman said, "Now, you son of a b——, get off," and thereupon stepped on his fingers (Dixon was holding on the car ladder), and kicked him loose, kicking him on the head and shoulders several times. By reason of such treatment, he was forced to let go of his hold on the ladder, and fell down on the track, the wheels of •the car running over his arm, and mangling it so that amputation was necessary.  This was the testimony of Dixon, which was  denied by the train men, but was a question that was

submitted to the discretion of the jury, and may be considered a fact established in the case. Upon trial, the jury brought in a verdict for plaintiff in the sum of $1,999.

It is assigned that the court erred, (1) in denying defendant's motion for nonsuit, made at the close of the testimony; (2) in denying defendant's motion for a new trial made upon the ground, among others, that the evidence was insufficient to justify the verdict, and that the verdict was against the law; (3) in allowing the witness Scheelke and the witness Reisinger to testify, over the objection of defendant, to statements made by plaintiff after the accident, to the effect that "that son of a b—— of a brakeman kicked him off the train;" and (4) in refusing to allow the witness Shields to testify to statements made to him by a stranger, at the time and place of the accident, as to the manner in which it occurred.

The question involved in the first and second assignments, which are argued together in appellant's brief, raises the question of the responsibility of a railroad company for the wanton and wilful act of a brakeman, resulting in injury to a trespasser, in the absence of evidence showing that the brakeman's act was within the scope of his employment. It is earnestly contended by the respondent, with some degree of reason, that this question cannot be raised in this court by the appellant, it not having been raised in the lower court. With the view we take of the merits of the case, it is not necessary, in the respondent's interest, to discuss this question, and we mention it only to prevent the claim which might be made in some future case that, under the doctrine of this case, the court had retreated from the position, which it has uniformly taken, that a case must be tried in this court upon the same theory on which it was tried below; but, inasmuch as the merits involve an important question, which is sure to rise at some

future time, we have concluded to enter upon a discussion thereof.

Of course, there is no question but that there is a sharp distinction drawn by the authorities between passengers and trespassers on a railroad car, but the distinction is as to the duty owing by the company, and not as to tortious acts committed on either passenger or trespasser. A high degree of care on the part of the company is exacted by the law, to insure the safety of the passenger who has, for a mutual consideration, placed himself in the care and under the charge of the company. To this degree of care, the trespasser is, of course, not entitled, for he has no contractual relation with the company, and cannot therefore plead, as can a passenger, that there is an implied provision in the contract that the company has employed suitable servants to run its trains. Standing as a naked trespasser, the company is not bound to consider his interests in the selection of its servants, or in the performance of its business in any way.

But, notwithstanding this distinction, the law, out of regard for common humanity, will not permit a master to allow his servant to unnecessarily abuse or imperil the life or limb even of a trespasser, and, if the company, through its servants, wilfully injure him, it will be liable, even though he may have been guilty of contributory negligence. It is well settled, generally, that a railroad company is responsible in damages to a trespasser for torts committed upon him by a servant who, in the commission of the tort, is acting in the line of his employment, and within the scope of his authority—not within the scope of his authority as applied to the commission of the tort, for no authority for such commission could be conferred, but within the scope of his authority to rightfully do the particular thing which he did do in a wrongful manner. And, while the master

will not be held liable for the wilful act of the servant not done to further or .protect the master's interest, or with a view to the master's service, if the servant is authorized to perform the duty, but in the performance of that duty acts wilfully or negligently to the detriment of another, the master will be held liable. So that the pertinent question in this case is, was the brakeman acting within the actual or implied scope of his employment, when he committed the act complained of?

Upon this question there is a great conflict of authority, many courts, as asserted by the appellant, holding that it is not within the implied authority of a brakeman to expel trespassers from the company's trains, but that their business, as their name implies, is to attend to the brakes on the cars. Many of the authorities cited by appellant, while discussing incidentally the question involved here, are based upon other principles, and are not of value in determining this question; and others, notably the text books, simply undertake to give an expression to the general current of authority. Thus, the appellant's citation from Patterson on Railway Accident Law, that the general rule is that, in order to render the railroad liable for the act of the servant, it must also be shown that the particular act which caused the injury was within the scope of the servant's employment, is of little value, for the question here is whether the act committed was within the scope of the servant's employment impliedly. It will not be contended anywhere that the railroad would be liable, if the servant was acting entirely without the actual or implied scope of authority, and upon an independent proposition not connected with the master's business. The same author, however, on page 109, after discussing this proposition and citing some cases holding in favor of appellant's contention, says:

"The doctrine of most of the cases, however, is that

wherever a railway servant is put in charge of any property of the railway, as a station master in charge of a station, or a conductor in charge of a train, or an engine-driver or fireman in charge of an engine, or a brakeman in charge of a car, that servant is necessarily charged with the duty of protecting that particular property, and he is, therefore, for that purpose vested with an implied authority to remove trespassers therefrom; and if he makes a mistake, either by removing a person who is rightfully therein or thereon, or by using unnecessary violence in the removal of a trespasser, the railway must be held liable for all such injuries as result, in the one case from the removal, and in the other case from the unnecessary violence with which that removal is effected."

It is further said, on page 110:

"The doctrine of the last mentioned class of cases seems to be sound, for, if the person who does the wrongful act be, in fact, a servant of the railway, and if the act be done in furtherance of the general purposes of the railway, and not to accomplish an independent personal purpose on the part of the servant, the railway ought to be held liable therefor, on the ground of an implied delegation to the servant of authority for the performance of the particular act, . . ."

There are, however, many cases cited by the appellant which hold directly that a brakeman is not within the actual or implied scope of his authority or employment when ejecting a trespasser from a train. The most pointed and strongest case on this question, among others, is *Farber v. Missouri Pac. R. Co.*, 116 Mo. 81, 22 S. W. 631, 20 L. R. A. 350, where it was held that it cannot be assumed, in the absence of proof, that a brakeman on a freight train was authorized to remove a trespasser. And, also, *Stringer v. Missouri Pac. R. Co.*, 96 Mo. 299, 9 S. W. 905; *Galaviz v. International etc. R. Co.*, 15 Tex. Civ. App. 61, 38 S. W. 234; *Texas & Pac. R. Co. v. Mother*, 5 Tex. Civ. App. 87, 24 S. W. 79; *Texas & Pac. R. Co. v. Moody,*

(Tex. Civ. App.) 23 S. W. 41; *Illinois Cent. R. Co. v. Latham,* 72 Miss. 32, 16 South. 757; *Marion v. Chicago etc. R. Co.,* 64 Iowa 568, 21 N. W. 86; *Towanda Coal Co. v. Heeman,* 86 Pa. St. 418. There are other cases holding substantially to the same doctrine, but those above mentioned are exactly in point, being brakeman cases; and the doctrine of those cases is, that it is well established, as a matter of rule and of common observation, that the conductor is in control of the cars, and that it is his duty to see that the cars are protected from trespassers; that it is the brakeman's duty to exercise this control only when he is authorized by the conductor to do so; and that, in the absence of proof of such authorization, he will not be regarded as acting within the scope of his authority.

There is, however, another line of authorities, most of which are of a more recent date, holding that it is a matter of common knowledge and observation, of which courts will take judicial notice, that it is the duty of a brakeman to exercise supervisory control over the cars, a control which includes within its limits the right to protect the cars by ejecting trespassers therefrom; and we are inclined to yield our allegiance to this doctrine. It must be evident to every one who travels on railroad trains that, while it may be true, theoretically, that the conductor is in charge of the cars, his special duties are more of a business character; that he looks out for the business of such train—if a passenger train, for the collection of fares and the proper exercise of the duties of the company towards passengers; if of a freight train, for the proper handling and transmission of freight, and for the direction of the movements of the train in a general way.

The business of a brakeman, while it may have originally been restricted to the operation of brakes, has grown into a supervision, to a certain extent, of the cars. He

meets you upon the platform, when you start to enter a car, and will not permit you to enter until he individually sees to it that passengers who desire to alight from the cars have alighted, thereby preventing the confusion and jostle incident to the unrestricted egress and ingress of the passengers; and, if a passenger were to insist upon disobeying his orders in this respect, and the brakeman assaulted him sufficiently to protect the interest of the company in carrying out his orders, we have no doubt that he could successfully plead the exercise of his duties in defense of the assault, in any court in the Union. He is found looking after the doors of the cars, to see that they are open at the proper time and closed at the proper time, and the ventilation of the cars. He will be seen in the performance of his duties on the top of the cars, where this brakeman was, and it is a fact notorious that he is exercising supervisory powers over the cars. It may be that these powers have increased with the changing conditions incident to railroading, and that the observation of this increase in his powers is the cause of the change in judicial decision on this question; for it is noticeable that most of the cases holding to the theory that the brakeman is not acting within the scope of his authority or employment, when ejecting a trespasser from the train, were decided many years ago, while the great majority of the cases holding to the other doctrine are of modern announcement. While this authority, of which we have been speaking, may not be strictly conferred upon the brakeman by the terms of the employment contract, we think that it must be a matter of common observation that such authority is an inference from the nature of the business, and its actual daily exercise.

In addition to this, the rule for which the respondent contends places the burden of proof where it justly belongs, viz., upon the railroad company, which has the knowledge

of its contractual relations with its servants, and can show lack of actual or implied authority, or usage or custom, which would raise the presumption of implied authority, if such authority or custom does not exist in the management of its business; while the party who is injured has not the benefit of this knowledge, and can only judge of who is in authority on a railroad train by appearances. Railroad employees as a rule are dressed in certain garbs that distinguish them as railroad men, and when a demand is made upon a passenger, or even upon a trespasser, by one of these men so distinguished, the presumption is that he speaks with authority, and the other party has no way of determining that he does not, except at his peril. It would be an impracticable thing to ask of a person, when a demand is made upon him by a brakeman, in regard to something which was connected with the business of the operation of the train, that he should go the length of a train to find a conductor to ask him if the employee with whom he was in controversy had authority to make the demands which he was making. So that no injustice can be done the railroad company in holding, as many of the cases do hold, that, in case of a brakeman ejecting passengers, whether trespassers or otherwise, the burden is upon the railroad company to show lack of actual or implied authority. Sustaining this view of the law, the respondent cites many authorities, among which is Baldwin's American Railroad Law, p. 254, where the rule, under the title "Brakemen," is thus tersely stated:

"It is prima facie within the implied authority of a brakeman, whether on a passenger or a freight train, to put off any person who is found upon it without right; and if he does this at an improper place or in an improper manner, whereby such person is unnecessarily injured, the company is liable, even if the act were wanton and reck-

less, provided it were not done to accomplish an independent, malicious purpose of his own."

This is a new work, issued in 1904. In *Smith. v. Louisville etc. R. Co.,* 95 Ky. 11, 23 S. W. 652, 22 L. R. A. 72, it was held that a brakeman on a railroad train, as well as the conductor, is conclusively presumed to have authority to eject trespassers or intruders, and if he uses unnecessary violence in doing so, the company is responsible for the injury resulting. And in that case it is said:

"The implied authority in such a case is an inference from the nature of the business, and its actual daily exercise, according to common observation and experience."

In *Hoffman v. New York Cent. etc. R. Co.,* 87 N. Y. 25, 41 Am. Rep. 337, it is held that the conductor of, or a brakeman upon, a railroad passenger train has authority to remove, in a lawful manner, a trespasser upon the platform of a car, whether the authority is conferred by the rules of the company or not; it is implied and is incident to his position. It is within the scope of the general authority of a brakeman on a freight train to prevent trespassers from getting on the train, and to remove such persons who wrongfully get thereon; but if, in so doing, he does not exercise care and caution, but acts wantonly or maliciously, and an injury results, the railroad company is liable. *Kansas City etc. R. Co. v. Kelly,* 36 Kan. 655, 14 Pac. 172, 59 Am. Rep. 596.

In *Lang v. New York etc. R. Co.,* 51 Hun 603, 4 N. Y. Supp. 565, a case where a boy without authority got upon a train, and the brakeman told him to get off, the boy refused to do so, and the brakeman threw a lump of coal on the top of the car which struck the boy on the head, whereupon he fell from the car under the wheels and lost his foot, it was held that the brakeman was engaged in the master's business and acting within the general scope of

the authority conferred upon him.   In the opinion it is said:

"It is not necessary to show specific order to brake-men, by the master, to drive off boys who were 'stealing a ride.'   The brakeman was engaged in the master's busi-ness, and acting within the general scope of the authority, .   .   .   The brakeman was apparently engaged for the defendant, and clearly was not pursuing his own purpose, .  .  ."

"It is within the scope of the implied authority of a brakeman in charge of a freight train to eject trespassers therefrom."   *O'Banion v. Missouri Pac. R. Co.,* 65 Kan. 352, 69 Pac. 353.

In *McKeon v. New York etc. R. Co.,* 183 Mass. 271, 67 N. E. 329, 97 Am. St. 437, a case decided November 18, 1902, it was held that a railroad company is liable to a boy who, when stealing a ride on the front platform of the baggage car of a passenger train, is recklessly pushed from the car by a brakeman of the company, while the train is in motion, and is injured by falling under it; that it is within the scope of the authority of a brakeman on a passenger train to remove, in a lawful manner, from the platform of a baggage car, one who is riding there for the purpose of evading his fare.   In the course of the opinion, it is said:

"A conductor has implied authority by virtue of his employment to eject a trespasser from the train under his control [citing *Ramsden v. Boston & A. R. Co.,* 104 Mass. 117, 6 Am. Rep. 200, and cases cited].   An engineer would probably have like authority to eject a trespasser from his engine.   A brakeman has less authority than either.   His duties primarily relate, as his name implies, to the management of the brakes.   But common observa-tion shows that on passenger trains they embrace much more, and that so far as the management of the brakes on such trains is concerned, their duties have been largely superseded by the appliances in use.   On passenger trains

brakemen are required to look after the safety and com-
fort of the passengers, to protect the property of the com-
pany, and to see that fares are not evaded. The rules of
the defendant company as well as common observation
show this. And while the brakeman in question was not
in any just sense a conductor or even a sub-conductor, we
think that the jury were warranted in finding as they must
have found under the instructions of the judge that it was
within the scope of his authority to remove the plaintiff in
a lawful manner from the platform if he was there for the
purpose of evading his fare."

In *Hill v. Baltimore etc. R. Co.*, 78 N. Y. Supp. 134,
decided October 10, 1902, it was held that, where a brake-
man on a railroad train, in order to eject one stealing a
ride, uses an unreasonable method, calculated to increase
the trespasser's danger, and such action is the proximate
cause of an injury, the railroad is liable. To the same
effect are *Chesapeake etc. R. Co. v. Anderson*, 9 Am. &
Eng. Railroad Cases (N. S.) 136; *Johnson v. Chicago
etc. R. Co.*, 116 Iowa 639, 88 N. W. 811; *Bjornquist v.
Boston etc. R. Co.* (Mass.), 70 N. E. 53; *Johnson v. Chi-
cago etc. R. Co.*, 123 Iowa 224, 98 N. W. 642, a case de-
cided February 20, 1904, and many other cases too nu-
merous to mention.

The testimony complained of in assignment No. 3, viz.,
that of the witness Scheelke and the witness Reisinger, to
statements made by the plaintiff after the accident, to the
effect that the brakeman kicked him off the train, we think
was plainly admissible under the doctrine of *res gestae;*
that it was a spontaneous, impulsive statement of fact,
while the boy was suffering intense and excruciating pain,
and under the excitement of the accident, when the natural
prompting would be to speak the truth. The testimony
was to the effect that they heard somebody crying for help;
that they ran down and found Dixon alone, holding his

21-37 WASH.

arm and crying; that it was between five and ten minutes after the accident occurred, and that, when asked what had happened, the answer above stated was given. This we think was sustained under the rule announced by this court in *Roberts v. Port Blakely Mill Co.*, 30 Wash. 25, 70 Pac. 111, and *Lambert v. LaConner etc. Trans. Co.*, 30 Wash. 346, 70 Pac. 960.

It is also urged by the appellant that, if the court was warranted in admitting, as a part of the *res gestae*, the testimony of these two witnesses, it committed error in refusing to allow the witness Shields to testify to statements made to him by a stranger, at the time and place of the accident, as to the manner in which it occurred. But we think the court did not abuse its discretion in this respect. There is no showing that the stranger, who was not able to be found at the trial, was in any way connected with the accident, or prompted by any circumstances to speak the truth in regard to it, and, under the circumstances, it seems to us that it would simply be the admission of hearsay testimony.

There being no error discoverable in the record, the judgment is affirmed.

MOUNT, C. J., HADLEY, and FULLERTON, JJ., concur.

RUDKIN, ROOT, and CROW, JJ., took no part.