NATIONAL LIFE & ACCIDENT INS. CO. *v.* FOLLETT.

(*Nashville,* December Term, 1934.)

Opinion filed March 19, 1935.

Auvergne Williams, Gordon I. Gordon, and J. C. Elmore, all of Memphis, for petitioner Jane C. Follett.

King & King, of Memphis, for National Life & Accident Ins. Co.

Mr. Chief Justice Green deliered the opinion of the Court.

This is a suit on an accident insurance policy in which there was a judgment for complainant. The Court of Appeals reversed that judgment and remanded the case for a new trial on account of certain evidence which that court thought improperly permitted to go to the jury. Both parties have filed petitions for *certiorari*, which have been granted.

Walter L. Follett, at the time of his death, was a man sixty-one years of age. He carried an accident policy with defendant insurance company, of which his wife, the complainant, was beneficiary, in the sum of $3,000.

The policy insured him "against loss of life . . . which results solely and without other contributing causes from accidental injury," and the policy provided: "Accidental injury as used in this policy means bodily injury suffered while this policy is in force, and which is effected solely and independently of all other causes through accidental means."

The deceased was superintendent of a concern known as the Wolf River Sand & Gravel Company in Memphis. According to the testimony of his wife, his neighbors, and his business associates, he was a man apparently robust, in good health, and a man who led rather an active life. So far as known, at the time of his death, he was not afflicted with any ailment.

Mrs. Follett testified that on the morning of December 21, 1932, while she was in her kitchen getting breakfast about 7 a. m., her husband passed through the kitchen going out to the garage in the rear. It was a cold morning, with snow and sleet on the ground. Follett told his wife that he was going out to warm up his car.

Mrs. Follett further testified that in about ten minutes her husband returned, faltering in his step, his

hands over the pit of his stomach, his face deathly pallid, and drops of perspiration as large as her little finger coming down the side of his face. That he was stooped over and said he had fallen against the car and struck himself in the pit of the stomach, and that he was knocked out. The witness said that Follett was nauseated, had a violent spell of vomiting which lasted about a half an hour; that he then went to bed and went to sleep; that she was in his room from time to time during the day; and that when she went in the room between 3:30 and 4 o'clock in the afternoon she found her husband dead. She called a neighboring physician, who arrived very shortly, and the latter said that Follett had been dead about a half an hour.

About noon during the day, Mrs. Follett and a neighbor named Deal went out to the garage and found that the car, a small coupé, had been backed about half way out, had been jacked up, and the left front tire, which was flat, had been removed. The spare tire had been taken off the carrier and placed by the wall of the garage near the front wheel. The flat tire had been put on the carrier, but had not been locked on. The lock was lying on the back part of the car, and the key was in the lock.

Deal and Mrs. Follett testified that they saw a cut place in the sleet or snow which looked like a footprint where some one had slipped. That this was just behind the car, and between two concrete runways leading to the garage. They said the garage was fifteen or twenty feet from the back porch of the house. The back porch was small, was two steps up, and led into the kitchen. Follett came back into the house over this porch and through the kitchen.

An autopsy was performed upon the body of Follett, under the advice of Dr. Kincaid, the family physician, on the day after his death. This autopsy was performed by Dr. McIntosh, who seems to be one of the leading pathologists in Memphis. Dr. McIntosh made a written report of the autopsy, which the doctors call a protocol. This protocol set out the condition of practically all the organs of the body as disclosed to Dr. McIntosh in his examination. The protocol is couched in medical and scientific terms, and is almost unintelligible to a lay reader.

Generally speaking, it may be said that the protocol indicated a diseased condition of the heart and other internal organs of the deceased. The determining question of fact in the case was of course whether Follett's death resulted from his alleged accidental fall "without other contributing causes" and "solely and independently of all other causes." In other words, whether the diseased condition of his organs, which the autopsy indicated, contributed to his death.

The jury found this issue in favor of the complainant, and this finding has been approved by both of the courts below. Nevertheless, the first contention of the defendant insurance company is that there is no evidence to sustain such finding.

Five doctors testified in the case. Two of them, Dr. Kincaid and Dr. Stern, expressed the opinion that Follett's death was caused solely by shock from his fall, and that the impaired condition of his internal organs did not contribute to his death. Dr. Kincaid examined deceased after his death, and assisted Dr. McIntosh in performing the autopsy. Dr. Stern based his opinion on the history of the case and on the protocol.

Three doctors, Dr. McIntosh, Dr. Mann, and Dr. Le Roy, expressed the opinion that the diseased condition of Follett's internal organs, as indicated by the protocol, certainly contributed to his death, if indeed such condition did not occasion his death, irrespective of the fall.

Dr. McIntosh, as above stated, performed the autopsy. Dr. Mann and Dr. Le Roy based their opinions on the history of the case and upon the protocol.

█ If all the evidence above detailed is competent, a matter which will be later discussed, it must be conceded that there is substantial evidence to support the finding of the jury and the result reached in the courts below. Follett's vigor and activity prior to this accident, his death so soon thereafter, and the testimony of Dr. Kincaid and of Dr. Stern, all this was quite sufficient to take the case to the jury.

The Court of Appeals reversed the judgment of the court below because of the manner in which the chancellor permitted Dr. Kincaid and Dr. Stern to be examined by complainant.

█ Hypothetical questions were put to these doctors embodying certain facts given in evidence and asking the doctors, upon such facts and upon their examination of the protocol, whether it "was likely" that the death of Follett resulted from a severe blow in the pit of the stomach solely and without other contributing causes. Both these doctors answered that it "was likely" that Follett's death was so brought about.

The Court of Appeals ruled that these questions asked the witnesses to express their opinions upon the very issue submitted to the jury, and, such being the situation, the court further ruled that the questions were

improperly framed under authority of *Cumberland Telephone & Telegraph Co.* v. *Peacher Mill Co.*, 129 Tenn., 374, 164 S. W., 1145, 1147, L. R. A., 1915A, 1045.

In so far as the questions propounded to the doctors called for an expression of opinion upon the very issue to be determined by the jury, we think that the questions were clearly unobjectionable. This is true because the issue to be determined by the jury, the cause of death, could not be intelligently determined, either by jury or judge, without the aid of medical advice.

There are broad statements in some of our cases, notably *Bruce* v. *Beall,* 99 Tenn., 303, 41 S. W., 445, that an expert may not express his opinion as to the ultimate fact to be determined by the jury. The same learned judge, however, who prepared the opinion of the court in *Bruce* v. *Beall,* later, in *Camp* v. *Ristine,* 101 Tenn., 534, 47 S. W., 1098, limited the authority of *Bruce* v. *Beall* to a holding that an expert might not give an opinion as to what is negligence in a particular case, when the facts having been made to appear to the jury, the jury was entirely qualified to determine for itself whether such facts constituted negligence.

We have many cases in which the ultimate fact to be determined by the jury has been regarded as a proper subject about which to bring out the opinion of an expert. In *Mayor, etc., of Knoxville* v. *Klasing,* 111 Tenn., 134, 76 S. W., 814, the question to be determined was the origin of disease, and doctors were permitted to testify directly as to their opinion upon that question. In *Knights of Pythias* v. *Steele,* 108 Tenn., 624, 69 S. W., 336, doctors were permitted to express their opinion as to whether a death resulted from suicide or disease; the very issue to be determined by the jury. So in *Burns* v.

*Welch,* 8 Yerg. (16 Tenn.), 117, experts were permitted to express their opinion as to the capacity of a sawmill; likewise the question to be determined by the jury. Since *Gibson* v. *Gibson,* 9 Yerg. (17 Tenn.), 329, physicians have been permitted to testify as to the mental capacity of a testator; the very issue to be determined in many cases arising upon an issue of *devisavit vel non.* Instances might be multiplied, but the foregoing are sufficient.

The true rule just here is stated in *McCravy* v. *State,* 133 Tenn., 358, 368, 181 S. W., 165, 168, and is that: ''Testimony is permissible allowing an expert to state a conclusion or give an opinion on a subject which is peculiarly a matter of superior knowledge on his part, for the reason that the lay mind is not so competent to form an opinion or reach a conclusion. Such expert opinion or conclusion, however, may be permitted only in matters peculiarly within the knowledge of an expert.'' The foregoing was quoted, approved, and somewhat elaborated in *Moon* v. *State,* 146 Tenn., 319, 242 S. W., 39.

In *McCravy* v. *State, supra,* and in *Nashville, C. & St. L. Ry.* v. *White,* 158 Tenn., 407, 15 S. W. (2d), 1, expressions of opinion by experts as to ultimate issues were held incompetent, because the basic facts having been made clearly to appear, the jury was fully competent to draw its own deduction without expert advice. In the first case, the question was whether a slender delicate woman could reach around with her right hand and shoot herself in the left side of the head. In the second case, the question was whether an electric signal or a flagman was a more efficient means as a warning at a crossing; the instrument having been fully described to

the jury. No expert knowledge was required to reach a proper conclusion in either case. There was no necessity for expert testimony in either case, and it is always to be remembered that expert or opinion testimony is admitted through necessity. *Gibson* v. *Gibson, supra.*

Expert testimony was necessary in the case before us. A proper conclusion as to the cause of Follett's death depended largely on deductions to be drawn from the protocol. No intelligent deduction therefrom was possible to a layman.

Recurring to *Cumberland Telephone & Telegraph Co.* v. *Peacher Mill Co., supra.* In that case a building was destroyed by fire and it was the contention of the plaintiff that the fire was caused by lightning coming into the building on a telephone wire, and it was averred that the telephone company had negligently failed to have ground connections and appliances near the point of the wire's entrance into the building. The ultimate issue for the jury was whether the building was directly struck by lightning or whether lightning followed the telephone wire into the building. The court evidently thought that, the circumstances being fully explained to them, the jury were competent to decide whether the lightning struck the house or struck the wire at a point distant from the house and ran into the house over the wire. In this view of the case, the court held incompetent a hypothetical question propounded to an electrical expert asking him to state whether it was probable or not that the fire was the result of lightning coming in on the wire. In such a view of the case it was naturally held that the trial judge erroneously permitted the expert to say that the fire was probably due to lightning discharged from the wire. The concluding paragraph in *Cumberland*

*Telephone & Telegraph Co.* v. *Peacher Mill Co.* has been the occasion of some confusion, and requires consideration. This paragraph is as follows:

"Generally speaking, and without stopping to define exceptions, it may be said that where the cause of an existing condition or injury is in dispute, and where the jury must determine which of the causes urged by the respective parties is the right one, an expert's opinion may be admitted to the effect that a certain cause could or might produce the condition; but to permit him to testify as to what in his opinion probably did it would be to supplant the jury by the witness."

Elsewhere in the opinion in *Cumberland Telephone & Telegraph Co.* v. *Peacher Mill Co.* it is intimated that expert evidence as to causation is not admissible. *Maitland* v. *Gilbert Paper Co.*, 97 Wis., 476, 72 N. W., 1124, 65 Am. St. Rep., 137, and *Hamann* v. *Milwaukee Bridge Co.*, 127 Wis., 550, 106 N. W., 1081, 7 Ann. Cas., 458, are cited to this effect. We think neither of these cases supports the idea. In the first case, the basic facts, from which the ultimate conclusion was to be drawn, were in dispute. The court held that an expert opinion directly expressed as to the cause of the accident was inadmissible. It was said the question should have been submitted in a hypothetical form and the witness asked to express his opinion upon the assumption that certain basic facts were true. We find little in the second case except a familiar ruling that, when the facts are made fully to appear to the jury, the question of negligence is ordinarily one for the determination of the jury, and not a question for expert opinion.

If special or expert knowledge is necessary for the proper determination of the cause of a condition, we

see no reason why such evidence should not be admitted just as in a case where such evidence is necessary to determine the existence of the condition itself.

Decisions of this court do not support the idea that expert evidence as to causation is inadmissible.

In *Mayor, etc., of Knoxville* v. *Klasing, supra,* the evidence of doctors was received tending to show that disease was caused by foul air and gases generated by garbage negligently dumped by the city into a sewer near plaintiff's residence. In *Knights of Pythias* v. *Steele, supra,* doctors' testimony was admitted tending to show that death was occasioned by disease and not by suicide. There are many cases in which expert knowledge is necessary to reach a conclusion as to the cause of a particular status found to exist.

The language above quoted from *Cumberland Telephone & Telegraph Co.* v. *Peacher Mill Co.,* to the effect that an expert witness interrogated as to the cause might be asked whether ''a certain cause could or might produce the condition'' but could not be asked ''what in his opinion probably did'' produce the condition, seems inapt, if such witness is only asked to draw a deduction from an undisputed premise, or from a premise hypothetically stated. *Sanders* v. *Blue Ridge Glass Corp.,* 161 Tenn., 535, 33 S. W. (2d), 84, likewise apparently approved this restriction upon the examination of expert witnesses, but in a purely incidental manner. The admissibility of no evidence was ruled upon in *Sanders* v. *Blue Ridge Glass Corp.,* but only the weight of certain evidence.

If it is necessary for a jury to have the advice and opinion of an expert witness in order to draw a proper conclusion from certain facts, a definite and positive ex-

pression from such a witness would be much more helpful to the jury than a qualified expression. The opinion is not to be received at all upon an ultimate issue of fact, if the jury is qualified to pass upon such an issue. However the opinion be phrased or formulated, it remains an opinion, which the jury is at liberty to reject. To restrict the expert's expression, however, to the subjunctive mood in addition to detracting from the force of the opinion tends to confuse the jury in weighing the testimony of the witness. Such mode of expression indicates that the witness lacks conviction when, as a matter of fact, he may be entirely convinced.

In *Cumberland Telephone & Telegraph Co.* v. *Peacher Mill Co.*, *supra*, the court cites *Illinois, etc., R. Co.* v. *Smith*, 208 Ill., 608, 70 N. E., 628; *Martin* v. *Light Co.*, 131 Iowa, 724, 106 N. W., 359, and *State* v. *Hyde*, 234 Mo., 200, 136 S. W., 316, Ann. Cas., 1912D, 191, as justifying the rule laid down for the examination of expert witnesses as to cause and effect.

As bearing upon the Iowa decision, we observe that *Bird* v. *Hart-Parr Co.*, 165 Iowa, 542, 146 N. W., 74, and *Stutsman* v. *Railroad Co.*, 180 Iowa, 524, 163 N. W., 580, later cases in that jurisdiction, do not restrict the examination of expert witnesses in the manner suggested in *Martin* v. *Light Co.* As bearing upon the Illinois decision, we quote the later Illinois case of *Chicago Union Traction Co.* v. *Roberts*, 229 Ill., 481, 82 N. E., 401, 402:

"The object of a hypothetical question is to obtain the opinion, upon a subject not within the knowledge of men of ordinary experience, of one who by a previous course of habit or study has acquired a knowledge of that subject. The hypothetical statement of facts must

be taken to be true. The opinion is permitted to be given to enable the jurors to draw the inferences from the evidence which their want of knowledge would otherwise prevent. In this case the question was whether the appellee's condition was due to traumatism or other causes. It was a question for the jury to determine, but it was impossible for them to answer without hearing the opinions of physicians. These opinions did not invade the province of the jury. . . . It is entirely immaterial whether the witness testified that the injury was the cause of the condition, or that the injury was sufficient to cause the condition or might have caused it. In any event, the testimony was merely the opinion of the witness, given as such, upon a state of facts assumed to be true. It still remained for the jury to determine the facts, and the opinion was nevertheless an opinion only, whether it states what did cause the condition or what might cause it. The question may be asked in either form.''

As bearing upon the Missouri decision, we refer to the later Missouri case of *O'Leary* v. *Scullin Steel Co.*, 303 Mo., 363, 260 S. W., 55, 59. Definitely overruling earlier decisions in that jurisdiction forbidding an expert witness to say more than that a particular cause might or could have resulted in an existing condition, the court said:

''It is not surprising to find that the rule has been criticized by courts and text-writers. If it is true that an opinion like that given in this case is erroneously received because it is an opinion 'upon the question the jury is to decide,' then every opinion in every case is incompetent for that reason, or it is immaterial. Unless the opinion of the expert aids the jury in its labors,

it is of no value, and for that reason is not admissible; and, if it does aid them, it is solely because it in some way points to the truth on the issue before them. If he points to the truth but partially, that will not save it from the rule, unless the court will hold that a 'reasonable' 'invasion of the province of the jury' can be tolerated.''

The "might" or "could" formula has not been regarded as necessary by this court in bringing out the conclusion of an expert witness as to the cause of a given result. In *Knights of Pythias* v. *Steele, supra,* and in *Mayor, etc., of Knoxville* v. *Klasing, supra,* it appears that the doctors testified directly in the one case as to the cause of the death, and in the other case as to the cause of the disease. In *Moon* v. *State, supra,* a determinative issue bearing on defendant's guilt was whether a woman, having shot herself through the heart, would have been able to fire other shots with a pistol. The doctor was asked if, in his opinion, "it would have been possible for that person to perform any deliberate act with their hands or any other part of the body." The doctor answered "it would not." The admissibility of this expert testimony in all three of these cases was bitterly contested and this court in all these cases ruled direct answers to the question mentioned to be competent.

We accordingly reach the conclusion that the court below properly admitted the testimony of Dr. Kincaid and Dr. Stern as to the probable cause of Follett's death, and the Court of Appeals improperly ruled to the contrary.

The defendant insurance company, by its petition for *certiorari*, questions the disposition made of the case in the Court of Appeals, assigning several errors.

It is first insisted that the Court of Appeals erred in approving the ruling of the chancellor admitting testimony of Mrs. Follett and the witness Deal, heretofore referred to, that they saw a footprint of a slip, or a place that looked like some one had slipped, in the snow in the rear of the automobile. The contention is that these were mere expressions of opinion on the part of these witnesses, and that such expressions were erroneously held competent.

We think there was no error in the action of the courts below in this particular. There is a class of opinion testimony from nonexperts that is admissible. In reality, such testimony describes observed facts in the only way in which they can be clearly described. When facts perceived by the senses are numerous and it is difficult to describe them in an adequate manner to the jury, and at the same time the conclusion or inference to be drawn from such facts is simple and well within the range of common experience and "the witness can relate what he has seen more accurately, as well as more easily, by stating his conclusion than by attempting to detail the evidential facts," the conclusion or inference is properly admitted. 11 R. C. L., 568. And see discussion of opinion evidence Wigmore on Evidence, sec. 1917 *et seq.*, and Jones on Evidence (2 Ed.), sec. 1241 *et seq.*

Applications of this principle are found in our own cases of *Pennington* v. *State*, 136 Tenn., 533, 190 S. W., 546; *Scott* v. *Union & Planters' Bank & Trust Co.*, 123 Tenn., 258, 130 S. W., 757, and *Cumberland Telephone etc., Co.* v. *Dooley*, 110 Tenn., 104, 72 S. W., 457. In the case before us the statement of the witnesses that they observed a mark in the snow or sleet that looked as

if made by some one who had slipped is perhaps the best and most intelligible description that could have been given of such mark. The subject of the inference, too, was well within the range of common knowledge.

It is next urged on behalf of defendant insurance company that the Court of Appeals erred in approving the ruling of the chancellor admitting the testimony of Mrs. Follett as to the statements made to her by her husband as to his falling and striking his stomach against the car. This evidence was admitted as part of the *res gestae,* and under later decisions of this court we think was competent.

It will be recalled that the garage was only fifteen or twenty feet from the Follett house, and that, according to his wife's testimony, Follett was out at the garage only about ten minutes before he returned in the condition she described. She said that he was in agony, his face pallid, large beads of perspiration exuding, that he was faltering in his step and holding the pit of his stomach. Under such circumstances, Follett stated that he had fallen against the car, struck himself in the pit of the stomach, and that he was knocked out. It also appears that he was nauseated, and a protracted vomiting spell immediately began.

While at the garage, Follett had gotten the car out, removed a flat tire, taken the spare tire off the carrier and had put the flat tire on the carrier. These operations must have consumed several minutes and, if he was out only about ten minutes, his return to the kitchen and his statement to his wife must have been made almost immediately after his fall. Naturally, too, after sustaining so painful a fall, Follett would have at once gone back into the house; so that his fall and his statement

must have been substantially contemporaneous.

■ In *Garrison* v. *State*, 163 Tenn., 108, 40 S. W. (2d), 1009, 1011, statements of a defendant in a homicide case, after he had walked some forty feet away from the scene of the shooting, were held admissible as part of the *res gestae*. The court reviewed our previous decisions and noted the difficulty that frequently arises in the application of *res gestae* rules to the facts of particular cases. The court reaffirmed the proposition that to be admissible as part of the *res gestae* the act or declaration must be substantially contemporaneous with the main fact, must spontaneously spring out of it, and must tend to illustrate, elucidate, or characterize it. But the court quoted and adopted the following from 16 Corpus Juris, 573:

"However, the word 'contemporaneous' as employed in the rule, is not to be taken in its strict meaning, nor is time the only criterion for determining whether a thing said or done is part of a given transaction, although closeness in point of time is an element for consideration; the ultimate test is spontaneity and logical relation to the main event, and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstance and at a time so near it as to preclude the idea of deliberation and fabrication, it is to be regarded as contemporaneous within the rule." *Garrison* v. *State*, *supra*.

While some other matters were discussed, the principal reason as disclosed in *Garrison* v. *State* for admitting the evidence in question was the apparent spontaneity of the statement of defendant. All the cases stress

the importance of this element. Such statements to be competent must not suggest fabrication, calculation, or design.

In the present instance, if Mrs. Follett truly described her husband's condition, it is unreasonable to believe that his challenged statements were influenced by any ulterior motive. Recovery upon an accident policy would not be in the mind of a man in Follett's plight. In *Parkey* v. *Yeary*, 1 Heisk. (48 Tenn.), 157, the court stated the test of the admissibility as *res gestae* of the statement of an injured party to be as follows:

"The declaration of a party to be used as evidence for himself must be made immediately on receiving the injury, and before he had time to devise anything for his own advantage."

We are satisfied that Follett, before making the statements attributed to him by his wife, had no time, nor was he in a condition, to devise anything for his own advantage.

It is quite generally held that statements of one injured made a few minutes after the accident, and while the declarant is suffering such pain and is under such excitement as to preclude any reasonable possibility of fabrication, are, as a rule, admissible as part of the *res gestae*. *Cleveland, etc., R. Co.* v. *Newell*, 104 Ind., 264, 3 N. E., 836, 54 Am. Rep., 312; *Frink* v. *Coe*, 4 G. Greene (Iowa), 555, 61 Am. Dec., 141; *Atchison, etc., R. Co.* v. *Johns*, 36 Kan., 769, 14 P., 237, 59 Am. Rep., 609; *Leahey* v. *Cass Ave., etc., Ry. Co.*, 97 Mo., 165, 10 S. W., 58, 10 Am. St. Rep., 300; *International, etc., Ry. Co.* v. *Anderson*, 82 Tex., 516, 17 S. W., 1039, 27 Am. St. Rep., 902; *Dixon* v. *Northern Pac. R. Co.*, 37 Wash., 310,

79 P., 943, 68 L. R. A., 895, 107 Am. St. Rep., 810, 2 Ann. Cas., 620.

The case of *Baxter* v. *Jordan,* 158 Tenn., 471, 14 S. W. (2d), 717, relied on by defendant insurance company, is not in point. The statements there held inadmissible were made by the injured party to his wife at a time several hours after the accident occurred, and after the injured man had gone to his home; the accident having happened at his place of business.

In *Kennedy* v. *Southern Ry. Co.,* 2 Higgins, 103, Judge HUGHES reviews the authorities at considerable length, and expresses the opinion that the trial judge possesses a large discretion in ruling on the competency of evidence offered as part of the *res gestae.* As heretofore seen, the trial judge in the case before us exercised this discretion favorably to the testimony.

Some other errors are assigned by defendant insurance company which we have considered and found without merit.

The decree of the Court of Appeals will be reversed, and the decree of the chancellor will be affirmed.