STATE of Tennessee, Appellee,
v.
Donald Eugene MABON, Appellant.

Court of Criminal Appeals of Tennessee,
at Jackson.

Dec. 30, 1982.

Permission to Appeal Denied by Supreme
Court March 14, 1983.

William M. Leech, Jr., Atty. Gen., Ann Lacy Johns, Asst. Dist. Atty. Gen., Nashville, Jerry G. Woodall, Asst. Dist. Atty. Gen., Jackson, for appellee.

James F. Butler, Franklin Murchison, Jackson, for appellant.

## OPINION

TATUM, Judge.

The defendant, Donald Eugene Mabon, and Eundra James Mabry were jointly indicted for first degree murder and armed robbery. Mabry pled guilty as a result of a plea-bargaining arrangement and Mabon went to trial on not guilty pleas. Mabon was found guilty of both offenses and sentenced to life imprisonment for first degree murder and 30 years for armed robbery. The trial judge ordered the sentences to run consecutively. On this appeal, Mabon has presented 10 issues for review. We find no reversible error and affirm the judgment of the trial court.

In the first issue, the defendant attacks the sufficiency of the evidence. These convictions grew out of a robbery of the Pizza Hut on South Highland Avenue in Jackson which resulted in the fatal shooting of Danny Laughlin, husband of the store manager, Betty Laughlin. We will summarize the facts established by the accredited evidence.

At about 9:00 P.M. on September 30, 1980, Mrs. Laughlin was working in the office of the Pizza Hut. Mabry entered and held a gun to her back, forcing her to accompany him to the cash register and open it. Mabry took the sum of $21.01 from the cash register. In the meantime, the defendant Mabon wielded a pistol and forced three male customers who were playing a computer game in the establishment

to lie on the floor. When Mr. Laughlin's truck was heard outside the building, the robbers forced Mrs. Laughlin and the three male customers into a back room.

Sandra Turner, a waitress, was not seen by the robbers. Although in hiding, she observed Mabry and Mabon grab Mr. Laughlin when he walked in and she saw them hit Mr. Laughlin with a gun. She then concealed her face when she heard several shots fired. None of the witnesses observed the actual shooting but they estimated that they heard three or four shots.

After the robbers left, Mr. Laughlin was found near the front door with his newly-acquired .22 caliber pistol lying close to his head. The pistol had not been fired.

Medical evidence established that Mr. Laughlin died as a result of three gunshot wounds. The victim also had lacerations in his scalp.

Police officers observed red spots just outside of the south door which led across the blacktop on the parking lot and terminated in the parking lot. These spots appeared to be blood.

Four .32 caliber spent cartridges were found on the floor of the Pizza Hut by a police investigator. Two spent .32 caliber bullets were found by the doctor in Mr. Laughlin's body and another .32 caliber bullet was found by a policeman at the Pizza Hut. The cartridge cases had been fired by the same semi-automatic weapon. The spent bullets had also all been fired from the same barrel.

Mrs. Laughlin and two of the men who had been playing the computer game gave police a description of the defendant and correctly selected the defendant's photograph in photographic lineups. They also positively identified the defendant in court. The third man who was playing the amusement machine could not identify any photographs shown to him "because he was mad at the police." The waitress, Sandra Turner, also identified the defendant.

Another witness, Eddie Lambert, testified that he was driving in a northern direction on South Highland about 9:30 P.M. on the night the crime was committed. He had stopped at a red light facing north when he saw a police car going south. A few seconds later a car approached him from the rear, which was the direction of the Pizza Hut, at a high rate of speed. This car stopped momentarily until the light changed and then proceeded at a high rate of speed. Mr. Lambert observed two black men in the car. Due to the speed of the car, Mr. Lambert took its license number. It was registered to Eundra James Mabry.

On application of the State, the trial judge ordered the defendant to permit a radiologist to x-ray his arms. The radiologist complied with the court's order and testified at trial that the x-ray revealed a broken bone in the defendant's forearm with two small metallic densities in the middle of the fracture site. This fracture was consistent with a gunshot wound although it could have been from other type wounds which result in metal particles being left in the bone. There were scars on the outside of the arm but the doctor was unable to determine what caused the scars. In the opinion of the expert, the fracture was at least 6 months old and not more than 5 to 7 years old. The examination was made September 24, 1981.

The defendant, Donald Eugene Mabon, testified that he was 22 years old and had served a term in the Shelby County Work Farm. He had been indicted on two counts of third degree burglary and entered a bargained guilty plea to petit larceny. While at the penal farm, he became acquainted with Mabry, who also lived in Memphis, and he and Mabry "stayed closely acquainted" with each other after being released from the Penal Farm. He denied ever wearing a blue denim cap with a narrow brim pulled down all around it. The State witnesses had earlier testified that he was wearing such hat when the crime was committed. He testified that he wore no hat except in the winter when he wore a knit toboggan.

The State witnesses had testified that the robber, who was identified as the defendant, had no hair. The defendant testified that he lost his hair because of a disease when he was very young.

The defendant denied being involved in the crime and stated that he was in Memphis at the time the crime was committed. He denied ever being in Jackson, Tennessee until the time of his arrest. He testified that his arm had bothered him while playing high school football but that he was not aware that his arm was broken. He did not know how metal particles could have gotten into his arm.

Ethel Ashley, testifying for the State in rebuttal, said that she was employed at the Krystal Restaurant in Jackson on September 30, 1980. During the very early hours of that morning, the defendant came into the restaurant wearing a blue denim cap with a brim pulled down all around it. Ms. Ashley had assisted the police in preparing a composite picture of the defendant and that picture was submitted in evidence.

In attacking the sufficiency of the evidence, the defendant does not question that two black males entered the Pizza Hut and committed the crimes of first degree murder and robbery. He raises only the question of "whether or not the evidence was sufficient to establish that the defendant, Donald Eugene Mabon, was one of those two black males." We answer this question in the affirmative.

■ The defendant was positively identified by four witnesses at the scene of the crime. Although the direct identification evidence was corroborated, this alone was sufficient to convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. The evidence meets the standard of Rule 13(e), T.R.A.P. and *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The defendant also attacks the credibility of the State witnesses but this question was resolved in favor of the State by the jury verdict. *State v. Hatchett,* 560 S.W.2d 627, 629 (Tenn.1978); *State v. Townsend,* 525 S.W.2d 842 (Tenn. 1975). We find no merit in this issue.

■ In another issue, the defendant says that the trial court should not have allowed police officers to testify that they observed what appeared to be blood near the door of the Pizza Hut and on the walkway or pavement outside immediately after the crime was committed. The officers testified that they observed "drops" or "spots" of the substance and that it "appeared to be blood." No scientific tests of the substance were attempted and the defendant insists that the testimony of the officers was not admissible to prove that the substance was in fact blood.

In *Schweizer v. State,* 217 Tenn. 569, 399 S.W.2d 743 (1966), the Supreme Court held that a lay witness could testify that he saw what he thought to be blood smears on the arm of the defendant. The court held that "such testimony is admissible to describe to the jury what the witness perceived by his senses in the only way that such perceptions could be clearly described." In *Schweizer,* the court cited with approval a discussion of this proposition from *National Life and Accident Insurance Company v. Follett,* 168 Tenn. 647, 80 S.W.2d 92 (1935). On these authorities, we hold that the evidence complained of in this issue was competent.

■ In two other issues, the defendant insists that the trial court erred in ordering the defendant to submit to an x-ray examination of his arm and in permitting the radiologist to testify as to the results of the examination. The testimony of the radiologist is summarized above in more detail. The State insists that these two issues were waived because the defendant did not file a pre-trial motion to suppress as required by Tenn.R.Crim.P. 12(b)(3), (f). The State did not raise this question at trial, however, when defense objection was made.

Apparently, both the State and the trial judge thought, as we do, that good cause existed for the failure to file a pre-trial motion by the defendant. The State had filed a pre-trial motion to require the defendant to submit to x-rays. The matter was argued pretrial and the trial judge made a pretrial order sustaining the State's motion. We do not think that Rule 12 required the defendant to request a second determination of this same issue by a pretrial motion and that this was sufficient cause to excuse the defendant from filing

the pretrial motion to suppress. See Rule 12(f). Under these circumstances, we have elected to review these issues on their merits.

■ The defendant insists that the taking of x-ray pictures violated his Fourth Amendment rights against unreasonable searches and seizures and his Fifth Amendment protection against self incrimination. The Fifth Amendment privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Therefore, an accused defendant may be compelled to submit to an x-ray examination without violating his right against self incrimination. See *Trail v. State*, 526 S.W.2d 127 (Tenn.Cr.App.1974).

■ We now address the question as to whether the x-ray examination violated the defendant's Fourth Amendment protection "against unreasonable searches and seizures." The defendant insists that the x-ray was a "search" in the constitutional sense, citing *Schmerber v. California, supra.*

In *Schmerber*, the United States Supreme Court was dealing with a situation where a police officer had arrested the defendant for driving while intoxicated. Schmerber had the odor of alcohol on his breath and there was other strong evidence to justify the arrest. Schmerber was taken to a hospital where a blood sample was withdrawn from his body for a chemical analysis to determine the percent by weight of alcohol in his blood. No search warrant was obtained. The court held that this intrusion into the human body was a search in the constitutional sense, saying:

"Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."

However, the court held in *Schmerber* that the failure to obtain a search warrant was justified in that case, because body functions would eliminate the alcohol in the blood during the time that would be required to obtain the warrant. We have no such exigent circumstances in the case at bar; the metal particles and evidence of a gunshot wound remain in the defendant's arm until this day. There is almost no possibility that the evidence can disappear or be disposed of.

In *United States v. Allen*, 337 F.Supp. 1041 (E.D.Pa.1972), it was held that,

"X-rays actually penetrate the body (and) we cannot say as a matter of law that it is less an invasion than the taking of blood."

Though dealing with a border search, which is not protected by the Fourth Amendment, the U.S. Court of Appeals for the Ninth Circuit, in *United States v. Ek*, 676 F.2d 379 (9th Cir.1982) held:

"We hold that the stricter standard required for a body cavity search also applies to an X-ray search. An X-ray search, although perhaps not so humiliating as a strip search, nevertheless is more intrusive since the search is potentially harmful to the health of the suspect. It goes beyond the passive inspection of body surfaces. We think that the use of such medical procedures should be restricted to situations where there is a clear indication that the suspect is concealing contraband within his body."

In *Weeks v. State*, 342 So.2d 1335 (Ala.Cr. App.1977), the court sustained a warrantless x-ray search. Though this opinion is not clear to us, we glean that it was sustained on the basis of exigent circumstances and probable cause. Also see *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) where the United States Supreme Court upheld a warrantless scraping of a suspect's fingernails in search of evidence. The court held that this was a "search" in a constitutional sense and was protected by the Fourth Amendment. However, the search was upheld on the ground that exigent circumstances justified the warrantless search since the evidence could have been easily and quickly destroyed.

Thus, in all of the above cases, x-rays and similar searches have been held to be protected by the Fourth Amendment requiring the issuance of a search warrant, absent exigent circumstances. As stated, no exigent circumstances were present in this case when the x-rays were made of the defendant's arm so a search warrant should have been obtained.

■ In this case, the x-rays were made by order of the trial judge on petition of the State and not by a search warrant. The Tennessee Rules of Procedure make no provision for the procedure employed; nevertheless, we have examined this proceeding to determine whether it is a constitutionally acceptable substitute for a search warrant. We find that it is not.

The petition filed by the District Attorney General is unsworn to and alleges no facts upon which the trial judge could determine that probable cause existed that an x-ray search would produce material evidence. The petition cites legal authority and merely states that it is, "for an order instructing the defendant to undergo x-rays of his hands and forearms." At the hearing on the petition, the State offered no evidence. The hearing consisted only of a statement by the District Attorney General and argument. The unsworn statement of fact given by the Attorney General was as follows:

"... The reason for this, Your Honor, is simply stated as follows: the proof in this case will show, Your Honor, at the time that Mr. Laughlin, who was not an employee and not a customer, his wife was an employee of a restaurant that was robbed, that during the incident in which Mr. Laughlin was allegedly shot and killed by Mr. Mabon in the presence of the co-defendant, Mr. Mabry, that Mr. Mabon received a gunshot wound to one of his arms. The proof will further show that a trail of blood, drops of blood leading from inside the restaurant, outside on the pavement and then they disappear, obviously that's because the defendant had gotten into an automobile.

Now, the proof will further show, if it please the Court, that some four to five days after the murder and robbery occurred that the defendant, Donald Eugene Mabon, is at the home of his father, Sylvester Mabon in Memphis, Tennessee. At that time one of his arms is bandaged and and (sic) his father makes some statement as to it being cut or hurt or injured."

The unsworn oral statements made by the Attorney General were based entirely on hearsay and contain no surrounding facts or circumstances from which the trial judge could independently judge the validity of the conclusion reached by the Attorney General. There was no indication as to how the State expected to prove the facts alleged to the trial judge, that the State witnesses were reliable, or who they were. The information given to the trial judge by the District Attorney General fell far short of the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The information given was insufficient to permit the trial judge to make an independent judicial determination of probable cause.

Since our rules make no allowance for the procedure utilized in this case, it is strongly suggested that if the State wishes to make application for a warrant in similar cases in the future, the application should be made in the usual way to the trial judge or another magistrate who is authorized to issue search warrants. See *United States v. Allen, supra* at 1044.

■ There yet remains whether the admission of the x-ray evidence requires a reversal. This being constitutional error, we cannot hold it harmless unless we are able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Huffman v. State,* 3 Tenn.Cr.App. 124, 458 S.W.2d 29 (1970). In view of these authorities and the others cited therein, we have concluded that the admission of the results of the x-ray exami-

nations cannot be deemed harmful in this case. The case against Mabon was not woven from circumstantial evidence. Mabon was positively identified by four witnesses at the Pizza Hut when the crime was committed. There was evidence that Mabry was the other criminal and two men were observed driving at a high rate of speed from the direction of the Pizza Hut immediately after the crime, in a car owned by Mabry. The defendant was in Jackson earlier that day at another eating establishment.

Although a substance which appeared to be blood was seen outside the Pizza Hut, the evidence is not strong that the defendant was shot in the Pizza Hut. The x-ray reflected only that the defendant had received a puncture-type wound which left two metal particles in his arm. One year after the crime was committed, the x-ray reflected only that the fracture of the arm was between six months and seven years old. In view of the overwhelming evidence of the defendant's guilt and the marginal significance of the x-ray evidence, we conclude beyond a reasonable doubt that the x-ray evidence was harmless and did not affect the result of the trial.

 The defendant next insists that the trial court abused his discretion in failing to grant a mistrial when the codefendant Mabry refused to testify. Mabry was called as a State's witness and the following occurred:

"MR. EUNDRA JAMES MABRY, after having been first duly sworn, refused to tell the truth, and the following proceedings were had:

MR. WOODALL: Your Honor, the witness was sworn and asked if he would tell the truth, and he said, 'no.'

THE COURT: Is that what you said?

THE WITNESS: Yes, sir, because I haven't been advised by my lawyer, I haven't talked to him and he told me he wanted to talk to me.

THE COURT: Who is your lawyer?

MR. WOODALL: Wait just a minute, Your Honor. Can we excuse the Jury?

THE COURT: Yes, the Jury is excused."

The defendant, without citing authority, insists that the trial judge should have granted a mistrial because of the aforesaid episode. The defendant's brief alleges that the refusal of Mabry to take the oath as a witness "would naturally tend to prejudice Mabon." We fail to see how Mabry's refusal to take the oath as a State's witness could in any way prejudice the defendant and the brief gives us no explanation of how the defendant is prejudiced. The trial judge did not abuse his discretion in denying a mistrial because of this incident. See *Frazier v. State,* 566 S.W.2d 545 (Tenn.Cr. App.1977). This issue is without merit.

 In two other issues, the defendant complains because the State asked him on cross examination if he was aware that Mabry gave a statement to the police and if he was aware that Mabry pled guilty. The episode occurred in the following context:

"Q26. You were indicted for robbery of the Pizza Hut with Mr. Mabry and also participating in the murder of Danny Laughlin, is that correct?

A. So I've been told.

Q27. Are you aware that Mr. Mabry made a statement to the police?

MR. BUTLER: Objection, Your Honor.

THE COURT: You won't be able to go into the statement.

A. I'm not aware of anything such of that nature.

Q28. Are you aware that Mr. Mabry plead guilty?

A. I read something about that.

MR. BUTLER: Your Honor, same objection.

MR. WOODALL: Your Honor, this is cross examination and I believe I can ask him anything I want to.

MR. MURCHISON: This is improper."

The jury was then excused and the defendant renewed his objections to the foregoing questions. The Attorney General offered to withdraw the questions and answers and stated that he did not intend to further pursue this line of questioning. The defendant asked the court for curative

instructions to the jury and the court complied with the defendant's request. No motion was made for a mistrial.

If error was committed, the trial judge did all that he was asked or had power to do to cure it. It is obvious from the record that the defendant was satisfied with the curative instructions given. The occurrence fell far short of the standard of "manifest necessity" for a mistrial to authorize the trial judge to order a mistrial *sua sponte*. See *State v. Barton*, 626 S.W.2d 296 (Tenn. Cr.App.1981). These issues are overruled.

 In the next two issues, the defendant complains that the trial court erred in permitting the state to cross examine as a hostile witness the defendant's father, who was a State witness and by allowing the testimony of Sgt. Carpenter to impeach the testimony of the defendant's father.

The State called the defendant's father, Sylvester Mabon, and asked him whether he saw the defendant with bandages on his arm during the first part of October, 1980. The father replied that he "never seed him with no bandages on." At a jury-out hearing, the District Attorney established that the witness had previously told a police officer that he had seen his son with an injury to his left arm, between the elbow and wrist, which was bandaged. The witness had told the officer that the defendant held his arm close to his body during this time. The witness denied ever making this statement to the police officer.

The District Attorney alleged that he was surprised by this contradictory testimony of the witness that he had never seen the defendant with bandages on his arm. The court permitted the District Attorney to impeach his own hostile witness by cross examining the witness. The court also allowed the testimony of the police officer, Sgt. Carpenter, to whom the contradictory statement was made.

In *Martin v. State*, 584 S.W.2d 830, 833 (Tenn.Cr.App.1979), this court stated the firmly entrenched rule on this subject:

"When a party calls a witness who turns hostile, such party may impeach the witness, *Montesi v. State*, 220 Tenn. 354, 417 S.W.2d 554 (1967), if the witness is indispensable or takes the party by surprise. *King v. State*, 187 Tenn. 431, 215 S.W.2d 813 (1948). The hostility of the witness may be shown through questioning the witness or by other circumstances. *Wilson v. Tranbarger*, 218 Tenn. 208, 402 S.W.2d 449 (1965)."

The evidence in this record is sufficient to show that the witness was hostile to the State's prosecution of his son. It was firmly established that the State was taken by surprise by the witness's testimony that he had never seen his son with an injured arm, in view of the contradictory statement he had given to Sgt. Carpenter. The evidence was not a collateral issue but had a direct bearing on the issue of guilt or innocence. The trial judge did not err in holding the defendant's father to be a hostile witness and in allowing the evidence of Sgt. Carpenter for impeachment purposes.

 The defendant complains that the trial judge abused his discretion in ordering the two sentences to be served consecutively. The trial judge found that the defendant was a persistent offender and a dangerous offender.

In *Gray v. State*, 538 S.W.2d 391 (Tenn. 1976), the Supreme Court designated the types of offenders for which consecutive sentencing should be reserved. One classification is the persistent offender, defined as one who has previously been convicted of two felonies or of one felony and two misdemeanors committed at different times when the defendant was over 18 years of age. As we read the direct examination of the defendant, he was charged with two counts of third degree burglary after he was 18 years of age. These two counts of burglary were reduced to petit larceny. The evidence was not fully developed in the record but it supports the finding that the defendant was convicted or pled guilty to both counts and apparently received concurrent sentences of not less than 1 nor more than 3 years confinement at the Shelby County Penal Farm. Petit larceny is a felony.

While armed robbery and first degree murder are both inherently dangerous offenses, there are aggravating circumstances which authorize consecutive sentences in this case. After committing the bold armed robbery in which both defendants were armed, the defendants heard the victim's truck being driven into the parking lot. Instead of leaving with the fruit of the robbery, they herded the occupants of the restaurant into a back room and waylaid the victim as he entered the door. They beat him severely with a pistol before firing four shots at him. Three of the shots entered the victim's body. Insofar as this record is concerned, the killing of the victim was completely wanton and useless. This aggravation was such as to authorize consecutive sentences under *Gray v. State, supra*.

We applaud the zeal of able court-appointed counsel for the defendant both in the trial court and in this court. However, we must affirm the judgment below.

BYERS and SCOTT, JJ., concur.