IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2017 Session

## STATE OF TENNESSEE v. KENNETH DARRIN FISHER

**Appeal from the Circuit Court for Anderson County**
**No. B1C00719   Donald R. Elledge, Judge**

_____

### No. E2016-01333-CCA-R3-CD

_____

The Defendant, Kenneth Darrin Fisher, was convicted by an Anderson County Circuit Court jury of attempted first degree murder, a Class A felony, for which he is serving an eighteen-year sentence as a Range I, standard offender. *See* T.C.A. §§ 39-12-101 (2014) (criminal attempt), 39-13-202 (2014) (first degree murder). On appeal, he contends that (1) the indictment is deficient, (2) the evidence is insufficient because the State failed to prove the offense occurred before the return of the indictment, (3) the trial court erred in failing to require the State to provide an election of the offense, and (4) the trial court erred in admitting testimony of a law enforcement officer regarding what the officer thought the Defendant would have done if the Defendant had not been stopped by the police. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

David A. Stuart, Clinton, Tennessee, for the appellant, Kenneth Darrin Fisher.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; David S. Clark, District Attorney General; Emily Abbott and Anthony Craighead, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction relates to the attempted first degree murder of his wife, from whom he was estranged at the time of the offense. The Defendant was intercepted by the police before he was able to harm the victim.

At the trial, Clinton Police Department 9-1-1 Center employee Amanda Carter testified that on the evening of August 26, 2011, she received calls from individuals who identified themselves as the Defendant's father and a friend of the Defendant. She identified a compact disc containing recordings of the calls, and the calls were played for the jury. In one call, the Defendant's father stated that the Defendant had left the father's house with an M14 rifle and ammunition and was "headed up towards LaFollette" because the Defendant was "after" the Defendant's wife, whom the father stated was living with another man and had asked for a divorce. In another call, the Defendant's friend, Jody Patterson, stated that the Defendant was "on his way back to Clinton right now" to a specified address. Mr. Patterson stated that the Defendant was coming to the address "to say 'bye' to some friends." Mr. Patterson said the Defendant had stated he was in the "Knoxville Oak Ridge area" and would call again when he was "on his way." Mr. Patterson stated the Defendant was armed with an M14 and "plenty of ammo." Mr. Patterson specified that responding officers should park in the back of a business at the address in order to prevent the Defendant from seeing them. Mr. Patterson stated that the Defendant was "AWOL" and that he had called the police because the Defendant's friends wanted the Defendant to get the help the Defendant needed.

Ms. Carter testified that she relayed to police officers the information that the Defendant was armed and that she provided the officers with a vehicle description and vehicle registration information. She said that the Defendant's father called 9-1-1 but that Mr. Patterson called a non-emergency line. When asked to rate on a scale of one to ten how excited the callers were, she said both callers were "[m]aybe a four, three to four."

Oliver Springs Police Officer Bruce Morgan, who was employed with the Clinton Police Department on August 26, 2011, testified that he heard radio calls about an armed male subject traveling in a described vehicle. He said that he and Officer Jackson were in the area where the vehicle was described as possibly being and that they parked nearby and watched the apartment to which the subject was supposed to be traveling. Officer Morgan said that within a few moments, they saw the vehicle that had been the subject of the radio calls and that they approached the Defendant, who was dressed in military fatigues and boots. He said he and Officer Jackson had their police-issued shotguns trained on the Defendant because the radio dispatch had included information that the Defendant might be armed with a rifle. Officer Morgan said that they ordered the Defendant onto the ground and that Sergeant Gregory handcuffed the Defendant, who did not struggle or resist. Officer Morgan said they removed "knives and stuff" from the Defendant's waistband and pockets. He said the Defendant had two knives, each of

which was sheathed and in a different pocket. One was a hunting or military-style knife, and the other was a "multi-tool" knife.

Officer Morgan testified that the Defendant appeared calm and did not appear angry or display any emotion. He said they did not check the Defendant for signs of impairment. He said that the Defendant was taken to a hospital for a medical evaluation and that if the doctors had determined during the course of the medical evaluation that a mental evaluation was needed, it would have been completed. The Defendant asked questions about what was happening at the hospital but was not demanding. Officer Morgan said the Defendant was taken to the police department and interviewed by Chief Becker. Officer Morgan said the Defendant had been arrested on a road that "leads from Caryville all the way to Knoxville" and that it could also be used to travel to Jacksboro and LaFollette.

Clinton Police Sergeant Scott Gregory testified that he came into contact with the Defendant shortly before midnight on August 26, 2011. He said he and other officers had been searching for a specific vehicle containing a person armed with a rifle based upon information they received from dispatch. He said that when he arrived at the address of an apartment in Clinton, other officers held shotguns toward the Defendant, who was "prone" on the ground. Sergeant Gregory handcuffed the Defendant and searched him for weapons, locating a large, green sheathed knife, a smaller multi-purpose tool in a case, and two other knives in the Defendant's cargo pants pockets. Sergeant Gregory said the Defendant was cooperative and followed Sergeant Gregory's commands. Sergeant Gregory said the Defendant stated that he was AWOL from Fort Drum and that he had been deployed to Afghanistan. Sergeant Gregory saw a rifle on the front passenger seat of the Defendant's car. Sergeant Gregory took a statement from Leslie Hannah Patterson,[1] a resident of the apartment. Sergeant Gregory identified photographs of the Defendant, the knives, and the rifle inside the car, which were taken at the scene. He said a magazine was "seated" in the rifle, meaning the rifle was ready to be fired. He said the magazine appeared to be capable of holding twenty rounds, but he did not know if it was loaded or if a bullet was in the rifle's chamber.

Sergeant Gregory testified that the scene where the Defendant was apprehended was a fifteen to twenty minute drive from LaFollette, but he said he had not measured it and would not be surprised if the drive took twenty-five to thirty minutes. He agreed it was necessary to drive through Jacksboro on the way to LaFollette.

---

[1] Elsewhere in this opinion, we have referred to Leslie Hannah Patterson as Leslie Hannah Burchett, the name by which she was known at the time of the Defendant's trial.

Leslie Hannah Burchett testified that she was Jody Patterson's ex-wife. She knew the Defendant from high school and said the Defendant and Mr. Patterson had been close friends. She recalled the police coming to her apartment on August 26, 2011, but she did not recall any telephone calls she received beforehand that night, Mr. Patterson's being home, or Mr. Patterson's calling the police. She recalled that the Defendant came to the apartment and that she had been outside smoking with the Defendant when the police approached. She said the police were there because the Defendant was "in trouble" but did not recall how the police were aware of the problem. She did not recall attending an event with the Defendant two weeks before August 26 and did not recall testifying at the preliminary hearing. She said the Defendant had told "us" that the Defendant's wife left him. She did not recall any discussion with the Defendant "concerning violence to his wife."

When shown the August 26, 2011 written statement she gave law enforcement, Ms. Burchett acknowledged she had no reason to believe the document was not authentic. She said she had been truthful in the statement. She read portions of the statement to the jury. The statement provided, in part:

> When [the Defendant] got home [to] Tennessee it was obvious he was not going back to Fort Drum. It was almost like he was a totally different person. He used to be a very laid-back, fun-to-be-around kind of person. After a day or two of coming back he started talking about where his wife Kendall Dunham was staying in LaFollette with Anthony Walden to kill her and him. I thought he was just blowing steam until he brought the shells bullets to do it with. He then proceeded to tell me how he was going to kill them. [The Defendant] told me he was just going to shoot Anthony but he was going to take his time with Kendall. He said he was going to start off by carving whore into her forehead so she would be marked for what she is and so the whole world would know it as well. [The Defendant] also told me that he was going to sew her vagina shut so she could never hurt anyone again. After he did this he said . . . he hadn't decided if he was going to shoot her or stab her. [The Defendant] had also said that if the police showed up during all of this he wasn't going down without a fight and the police weren't going to take him until he was either out of bullets or dead. He told me he wasn't going to pull the trigger on himself, he would force someone else to. He had also said over and over he wished he was dead.

After reading the statement, Ms. Burchett acknowledged her signature but stated that although she recalled giving the statement, she had no recollection of the conversation with the Defendant it referenced. She said she had anxiety and depression and that although she had taken anxiety medication at the time she gave the statement, she did not take it at the time of the trial.

When shown a transcript of her preliminary hearing testimony, Ms. Burchett said that reviewing it did not refresh her memory of having gone somewhere with her ex-husband and the Defendant a few days to a week before August 26, 2011.

Rachel Shell, an employee of the general sessions court, testified that she had been asked to provide the recording of the Defendant's preliminary hearing relative to the testimony of Leslie Hannah Patterson, which other evidence showed was the name by which Ms. Burchett was formerly known. The recording was received as an exhibit and played for the jury.

The recording of the preliminary hearing reflected that Ms. Burchett testified she and her husband had talked to the police about the Defendant one to one and one-half weeks before August 26, 2011. She said they went to the police because the Defendant made statements about killing his wife a few days earlier and because they saw him buy bullets at a gun show the day before they went to the police. She said they took the bullets to the police. She said the police stated they could not arrest the Defendant for "talking s---." She said that after they went to the police, she had two or three conversations with the Defendant in which he spoke of killing his wife. She said the Defendant stated his wife had hurt him and antagonized him on the telephone. She said the Defendant stated he wanted to "kill that b----" and shoot and kill the man with whom she lived. She said the Defendant stated he was going to carve "whore" in his wife's forehead in order to warn others and prevent her from hurting anyone else. She said the Defendant did not know if he would shoot or stab his wife.

In the recording of the preliminary hearing, Ms. Burchett testified that on August 26, 2011, she learned what was occurring relative to the Defendant when the Defendant's father called her home. She said both the Defendant's father and Ms. Burchett's then-husband, Mr. Patterson, called the police because they did not know the Defendant's state of mind. She said Mr. Patterson called the Defendant and learned the Defendant was driving toward Knoxville. She said she spoke to the Defendant, who did not state where he was going or what he was doing when she questioned him. She said he stated, "I've got to do it." She said that she invited the Defendant to come to her and Mr. Patterson's home and that the Defendant agreed. She said the Defendant arrived about one and one-

half hours later. She said she went downstairs, hugged the Defendant, and asked where he was going. She said he responded that she knew where he was going. She said she asked him to smoke a cigarette with her. She said that as the Defendant went to his car to get a cigarette, two police officers ran across the street with shotguns. She said the officers detained the Defendant, searched him, recovered knives, and handcuffed him. She said that the Defendant told the police he was not in his right mind, that they told him "this was not the right way to go about it," and that an officer said the Defendant was under arrest. She said the Defendant was cooperative and honest with the police. She said that when an officer stated a gun was in the Defendant's car, the Defendant stated that a clip was in the gun, but no bullet was in the chamber. She said she had heard everything said between the police and the Defendant. She never heard the Defendant say he had intended to kill his wife. She did not hear the police read the Defendant his rights.

In the recording of the preliminary hearing, Ms. Burchett testified that the Defendant had also spoken of going into the mountains of Tennessee or to South America because he was heartbroken and did not think he could "deal with it anymore." She said that although she did not know the Defendant's wife's whereabouts on August 26, 2011, she understood the Defendant's wife might be in the Jacksboro/LaFollette area. She agreed that if the Defendant had gone to Knoxville, he would have been driving away from, rather than toward, the area where his wife was living.

Clinton Assistant Police Chief Vaughn Becker testified that he responded to the scene on August 26, 2011. He said the Defendant was handcuffed and seated on a sidewalk. Assistant Chief Becker photographed the contents of the Defendant's car. He identified a photograph of two, ten-round magazines of .308 NATO ammunition that had been under a bag of clothing in the passenger seat of the car. Other photographs he identified depicted binoculars, a bag containing loose .308 ammunition rounds and a twenty-round ammunition magazine, and a .308 ammunition round on the driver's seat. Another photograph he identified showed an M14 rifle with its action open and empty.

Assistant Chief Becker testified that he collected the evidence after photographing it. He identified the knives that were collected from the Defendant. He also identified a package of 100 forty-nine grain full metal jacket .308 NATO Federal brand bullets. He identified a Springfield Armory M14 rifle that was recovered from the Defendant's car and said the previously-identified bullets were the appropriate ammunition for the rifle. He identified the ten-round magazines recovered at the scene and said they were full and had been on the passenger seat under clothing next to the rifle. He identified a twenty-round magazine found on the passenger seat and said it contained nine rounds. He

identified a second twenty-round magazine, which he said had been in the rifle, and said it had been fully loaded.

Assistant Chief Becker testified that he interviewed the Defendant at the police department. Assistant Chief Becker said that he advised the Defendant of the Defendant's *Miranda* rights and that the Defendant waived his rights. Chief Becker said the Defendant did not appear to be under the influence. He identified a video recording of the interview, which was received as an exhibit and played for the jury. In the interview, the Defendant stated the following: He and his wife had been married for three months. Two weeks before the date of the statement, the Defendant's wife left Fort Drum after telling him she had to go home to help with her mother. The Defendant said he left Fort Drum "to come home to fix it." He said he learned that his wife had confessed to her best friend that she was having sex with other men during the marriage and that one of his best friends tried to have a "threesome" with her. He said a friend advised him that the Defendant's wife had only "played" him "for the money." The Defendant stated that his wife hated him and refused to talk to him and that she was in LaFollette. He said that before he was apprehended, he had intended to locate his wife and kill her "before she could do that to anyone else" and that he planned to leave the country. He said he had intended to shoot his wife in the leg to prevent her from fleeing, cut a tattoo off her arm, and kill her by shooting her again. He said the tattoo had the date of his wife's miscarriage and that he had intended to tell her it was good she had miscarried because a child "didn't need a whore as a mom." He said that although he did not know his wife's address in LaFollette, he had a photograph of the car she had been driving. He said he had also planned to kill the man with whom his wife was involved. He said the M14 rifle belonged to his father. The Defendant stated that he stopped in Clinton because his friends Jody and Hannah wanted to see him before he left. He said he had discussed his plan with them previously. When asked about a "round" on the driver's seat, he said the gun had never been loaded and that he had begun loading a second, twenty-round magazine from a bag of 100 rounds. When asked if he had planned to kill himself, he said that he had planned for the police to come and that he planned to die in a shoot-out. He acknowledged that he was AWOL from Fort Drum and said he had considered volunteering for a deployment but decided to come home instead. He said that he had intended to talk to his parents but that they had not answered his call. The Defendant stated that he had last been in contact with his wife the previous week and that she knew he had come home. He said he had developed the plan to kill his wife the previous week, after he learned "the whole thing was a lie."

In the statement, the Defendant said that the previous evening, he had been at home and asked his father for permission to clean the guns. He said his father kept the

guns and ammunition in a safe. He said he removed screws that secured windows of the house and disabled an alarm. He said he went out a window with an M14 and ammunition and ran to his car. He said his father called two minutes later, but he did not answer. The Defendant said Mr. Patterson called and then sent him a text message when he did not answer the call. He said Mr. Patterson had advised him that the police would be looking for him. The Defendant said that he later spoke to Mr. Patterson and that Mr. Patterson and Ms. Burchett wanted the Defendant to visit them. The Defendant said he had been "going off toward Lovell Road" but turned around. He said he stopped on the way to Clinton, changed into his uniform, and loaded a magazine. He said that after he arrived at Mr. Patterson and Ms. Burchett's home, Ms. Burchett asked where he was going and what he was doing. He said he responded, "You know where I am going. I have to do this for me. I have to get closure." He said she told him that he did not have to do it and asked him to smoke a cigarette with her. He said that the police approached him as he was getting a cigarette from his car. He said he cooperated with the police. He thought that he had 143 rounds of ammunition in his car and that twenty of them were for hunting. He said he obtained the ammunition "just the other day." The Defendant stated that he knew he should return to Fort Drum but that if he did so, he would kill one of his best friends because the man had been with the Defendant's wife.

Assistant Chief Becker testified that the Defendant was calm and did not seem surprised or confused. He agreed that Lovell Road was the opposite direction from LaFollette if a person were traveling from the Defendant's father's house. He agreed that he determined that the Defendant left the Defendant's father's house, had driven near Lovell Road, turned around, stopped at Melton Hill Lake to change clothes and load his ammunition, and went to Mr. Patterson and Ms. Burchett's home in Clinton. Assistant Chief Becker said his understanding was that the Defendant stopped to load ammunition after speaking with Mr. Patterson. Assistant Chief Becker said the Clinton address on the Defendant's driver's license was in Anderson County. When asked what he thought the Defendant would have done if the Defendant had not been stopped by the police, Assistant Chief Becker said he thought the Defendant would have found and killed the Defendant's wife. Assistant Chief Becker said the Defendant stated he had planned for about one week to kill his wife. Assistant Chief Becker said the Defendant never stated he had not really planned to kill his wife. Assistant Chief Becker acknowledged that he had been concerned about the Defendant's mental health on the night the Defendant was taken into custody and that he had been the person who decided that the Defendant would be taken to the hospital for a mental evaluation. Assistant Chief Becker agreed that he had concerns about the Defendant's being homicidal and suicidal.

The Defendant testified that he had been in the Army, had been stationed at Fort Drum, and had been deployed to Afghanistan. He said that he did not experience combat but had been threatened by children with weapons on three occasions while he was in Afghanistan. He said that although the military rules of engagement dictated that he should have killed these individuals, he did not because they were children. He said he returned to Fort Drum from Afghanistan approximately five months before August 2011. He said that he had known his wife since high school and that they were married after he returned from Afghanistan. He said they had not dated previously, that he had been indoctrinated during the deployment to believe the military was "the best," and that he wanted to start a family with his wife. He said that he believed at the time that she was in love with him and that he loved her. He said that after he and his wife were married, his father advised him of a rumor about his wife's having been unfaithful and that his wife's best friend said his wife had been unfaithful. He said he became angry and developed the homicidal thoughts about which Assistant Chief Becker testified. The Defendant said he knew his wife was in the LaFollette area. When asked if he would have carried out his plan if he had encountered his wife on August 26, 2011, he said he had not been able to kill the children in Afghanistan and asked, "How could I kill an innocent civilian and whoever she was with."

The Defendant testified that when he left his father's house on August 26, 2011, he went toward Lovell Road in Knoxville. He said he did not know his destination. He said that when Mr. Patterson advised him the police were looking for him, he thought it was because he was AWOL. He thought Mr. Patterson had told him about the police looking for the Defendant before the Defendant asked his father to clean the guns and before the Defendant left Anderson County. The Defendant said he thought he needed to get out of town and get a fresh start. The Defendant said that when Mr. Patterson called and wanted him to come to Mr. Patterson's house to say goodbye, the Defendant wanted to see his friends one more time before he "took out and went [somewhere he] didn't know anybody." He recalled that after he turned around and drove toward Clinton, he stopped but did not recall why.

The Defendant testified that he was at Mr. Patterson and Ms. Burchett's house for ten to fifteen minutes before the police approached him. He said he knew the people who approached him were police because he had heard the sounds of their rifles. He acknowledged he had thought about committing "suicide by cop" but did not think he would have acted on the thought.

The Defendant testified that he had given the recorded statement voluntarily. He said he never thought he could have committed the crimes he described to Assistant Chief

Becker.  He said that his thoughts had been disturbing and that he had been "young and stupid" and "in a messed up place."  He said he thought the best thing he could do was to tell the police about his thoughts because they would ensure he did not act on the thoughts.  He said he did not regret telling Assistant Chief Becker about his thoughts because he knew "it stopped something from happening." The Defendant said he felt better after telling Assistant Chief Becker about the thoughts because the Defendant knew he could not do anything to make his thoughts happen.  The Defendant said that after telling a law enforcement officer about thoughts of this nature, "They can put you in handcuffs and make sure you don't do anything that you'd regret."  The Defendant said he had a "slim thought" of carrying out his thoughts about harming his wife but denied his harmful thoughts had been intentions.  He said they were merely a "disturbing fantasy."  He agreed, however, that the only reason he did not kill his wife was because the police stopped him.

When asked if he recalled telling Ms. Burchett that he intended to sew his wife's vagina closed, the Defendant testified that he did not remember exactly what he told Ms. Burchett.  He said he "might have" said it.  He said he knew he said "some disturbing things like the whore and the tattoo."  He agreed he had gone to a gun expo with Mr. Patterson and Ms. Burchett and that he bought bullets at the expo.  He said, however, that he had not remembered until the trial that he had gone to the expo and claimed he did not recall whether he bought bullets at the expo in order to kill his wife.  He thought his buying the bullets was an "act of need" to show that he was having disturbing thoughts about which he was conflicted.

The Defendant acknowledged that he had not wanted his father to know he took the rifle out of the house and that he snuck out of the house with the rifle, his military fatigues, and over 100 rounds of ammunition.  He also acknowledged he did not answer when his father called him.  He acknowledged telling Mr. Patterson, "I've got to do this, I've got to get closure."  He acknowledged saying in his police interview that he had gone to Mr. Patterson's house to say goodbye to his parents and to apologize for leaving without saying goodbye to them.  The Defendant acknowledged saying he had come up with the plan to kill his wife when he found out "the whole thing was a lie."  He also acknowledged that he had not told the police the plan to kill her had been a fantasy.  He did not think the police asked if he would go through with the plan.

The jury convicted the Defendant of attempted first degree murder.  This appeal followed.

-10-

# I

## Deficient Indictment

The Defendant contends that the indictment is deficient on its face because it does not allege that he attempted to commit first degree murder by one of the three alternative means by which first degree murder may be committed, does not allege the specific mode of criminal attempt, and does not allege an overt act which constitutes the offense. The State contends that no deficiency existed because the indictment properly notified the Defendant of the crime with which he was charged, conferred jurisdiction on the trial court, and protected the Defendant against double jeopardy. We agree with the State.

An individual accused of a crime has the right to be informed of the nature and cause of an accusation against him. U.S. Const. amend. XI, XIV; Tenn. Const. art. 1, § 9. Pursuant to Tennessee Code Annotated section 40-13-202 (2012), an indictment

> must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Our supreme court has said that an indictment is sufficient if it provides adequate information to enable the defendant to know the accusation against which he must defend, furnishes the trial court with an adequate basis for entry of a proper judgment, and protects the defendant from double jeopardy. *See State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). The supreme court has said that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). In this regard, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000).

The indictment in the present case states:

THE GRAND JURORS FOR THE STATE OF TENNESSEE, duly elected, impaneled, sworn, and charged to inquire in and for the body of the County of Anderson in the state aforesaid, upon their oath, present that

-11-

heretofore, to wit, on or about August 14, 2011 through August 26, 2011 before the finding of this indictment, in the County aforseaid, did then and there unlawfully, feloniously, intentionally and premeditatedly attempt to kill and murder Kendall Dunham, a violation of T.C.A. 39-12-101 and T.C.A. 39-13-202; against the peace and dignity of the State of Tennessee.

The Code provides three means by which a defendant may commit the offense of first degree murder:

(1) A premeditated and intentional killing of another;

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy; or

(3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb[.]

T.C.A. § 39-13-202(a)(1)-(3).[2]

The Code provides three means by which criminal attempt may occur:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

---

[2] We note that attempted felony murder is not an offense in Tennessee. *See State v. Kimbrough*, 924 S.W.2d 888 (Tenn. 1996); *see also* T.C.A. § 39-13-202(a)(2) (first degree felony murder).

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

*Id.* § 39-12-101(a), (b).

We address, first, the Defendant's argument that the indictment was deficient because it failed to specify which subdivision of Tennessee Code Annotated section 39-13-202(a) the State alleged he attempted to commit and which of the three modes of attempt his actions satisfied. The Defendant argues for more specificity than the law requires. The indictment referenced the statute and placed the Defendant on notice of the charged offense. *See Hammonds*, 30 S.W.3d at 300; *Sledge*, 15 S.W.3d at 95. The indictment also provided the trial court with a basis upon which to enter judgment. *See Wyatt*, 24 S.W.3d at 302. The indictment named the victim and provided a time period during which the State alleged the offense occurred, affording the Defendant protection against double jeopardy for any subsequent prosecution for the same offense against the victim in the specified time period. *See Hammonds*, 30 S.W.3d at 301 (relying on *Wyatt*, 24 S.W.3d at 324-25).

The Defendant also argues that the indictment failed to contain an allegation that he committed an overt act in the commission of the offense on a specific date. Although the indictment did not state the specific theory or means by which the State alleged the Defendant committed the offense, such is not required in order to provide the Defendant with notice. *See Hammonds*, 30 S.W.2d at 300; *Wyatt*, 24 S.W.3d at 324 (noting that "[t]he indictment makes no reference to the attempt statute's numbered subsections nor does it specify a specific act or course of conduct constituting the 'attempt to kill'" and holding that the indictment was sufficient). As we will discuss further in section III relative to the adequacy of the State's election of offenses, the State alleged that the Defendant's course of conduct constituted a substantial step toward the attempted first degree murder of his wife, not that any one discrete act constituted the offense. The Defendant's position is that the State's proof shows multiple actions over a course of several days, any of which could constitute the offense, and that the State should have been required to choose a single action on a specific date upon which to rely in seeking

-13-

the conviction. We acknowledge the portion of *Wyatt* upon which the Defendant relies, in which the supreme court "encourage[d] the State to charge the crime of attempt in such a way that informs the defendant of the precise act or acts against which he is being called upon to defend." *Wyatt*, 24 S.W.3d at 325. *Wyatt* noted, however, that the defendant in that case would have been well-served by moving for a bill of particulars and that issues of this nature were best resolved on a case-by-case basis by the trial courts. *Id.* As we will discuss in section III, the record in the present case reflects that the Defendant moved for a bill of particulars and that the State filed a detailed response outlining the conduct it alleged constituted the offense and the relevant dates on which the conduct occurred. We note that the Defendant was charged with a single count of attempted first degree murder and that the evidence showed the commission of a single offense. To the extent that the Defendant contends that the indictment was deficient, his argument is undermined by the detailed bill of particulars filed by the State.

The indictment was legally sufficient. The Defendant is not entitled to relief on this basis.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient because the State failed to prove the offense occurred before the return of the indictment. He does not challenge the sufficiency of the State's proof otherwise. The State contends that the proof the offense occurred before the return of the indictment is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v.*

-14-

*Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-11-201(a)(4) (2014) provides that a defendant may not be convicted of an offense unless the State proves beyond a reasonable doubt that "[t]he offense was committed prior to the return of the formal charge."

> The indictment is not to be considered evidence of a defendant's guilt, *see* [*State v. Bane*, 853 S.W.3d 483, 484 (Tenn. 1993)], but we do believe the indictment itself can establish the date upon which it was returned. Thus, the reading of the indictment to the jury, coupled with evidence of when the offense was committed, would establish that the offense was committed prior to the return of the indictment. Also, the State could merely ask an appropriate witness whether the actions of the defendant constituting the offense occurred before the defendant was charged with that offense. This would satisfy the requirements of the statute as well.

*State v. Brown*, 53 S.W.3d 264, 279 (Tenn. Crim. App. 2000).

In the present case, the indictment was read to the jury. The portion of the indictment which states that the Defendant committed the offense "on or about August 14, 2011 through August 26, 2011 before the finding of this indictment" was included when the indictment was read to the jury. The indictment was dated January 3, 2012. The jury was instructed that the indictment was not evidence that the crime itself occurred. The trial evidence established that on August 26, 2011, the Defendant was apprehended by the police and gave the incriminating statement about his preparations and intent to kill his wife.

The reading of the indictment, coupled with the trial evidence about the commission of the offense, satisfied the first alternative stated in *Brown* relative to establishing that the criminal offense occurred before the return of the indictment. In his reply brief, the Defendant quibbles with the difference between the language "before the finding of this indictment" stated in the indictment, as compared with "prior to the return of the formal charge" as specified by Code section 39-11-201(a)(4). He cites no legal authority to support his argument that the difference holds any significance, and we are

-15-

unpersuaded that any significance exists. The Defendant is not entitled to relief on this basis.

## III

### Election of the Offense

The Defendant contends that because the State offered proof of multiple acts constituting the offense charged in the indictment, the trial court erred in failing to require the State to provide an election of the offense. The State contends that the trial court did not err because no election was required. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

-16-

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

In the present case, the State's theory was that the Defendant undertook a course of conduct which, viewed cumulatively, constituted a substantial step toward the premeditated murder of his wife. When the Defendant moved for a bill of particulars before the trial, the State filed a response that detailed the actions constituting the course of conduct upon which it relied. In denying the Defendant's motion to require the State to make an election at the close of the State's proof, the trial court observed:

> Let the record reflect that the Court certainly finds the argument by defense counsel unique but the Court further finds that the argument is not consistent with the law as I read it. . . . There's a difference between the election of offenses versus the election of various acts that constitute the entire course of action that constitutes a substantial step towards the act of murder. It's not just one thing, it's his entire course of conduct that constitutes the substantial step. And that's what the Court is looking at and I think that's the intent of the law. You can't just say the fact that he loaded

-17-

up four clips with three-0-eight rounds that he had his gun upside down in his car so that all he had to do is pick it up, pull the lever back and start firing a twenty-round clip, that he had four weapons and that each in and of themselves is not a substantial act. But when you view the entire course of conduct, including his own admissions to Officer Becker when Officer Becker asked him; said, what were your intentions tonight before the police had contact with you. My intentions were to go over there and kill her. That's his entire course of conduct. And if you'll remember Hannah Patterson [Burchett] shortly after this arrest occurred and her testimony was that when she called him and asked him to come over and said, you know, where [are] you going; and he said, you know where I'm going. Because he had told her that's what his course of action was going to be. I think the law assumes that the entire course of action constitute[s] a substantial step toward the commission of the crime that he was prevented from committing. So for those reasons, I will deny that motion.

Like the trial court, we disagree with the Defendant's contention that the proof showed multiple acts which could separately constitute the offense of attempted first degree murder. The State did not theorize that any one act or that certain of the Defendant's acts constituted the offense. Rather, the State theorized that the Defendant embarked upon a course of conduct which, viewed collectively, constituted the attempted first degree murder of his wife. The record reflects that the State's response to the Defendant's motion for a bill of particulars informed the Defendant of the State's course-of-conduct theory and that the State proceeded at trial in accord with its theory. Thus, the Defendant was able to prepare for and defend against the charge. *See Adams*, 24 S.W.3d at 294. He was adequately protected against double jeopardy by the indictment and bill of particulars, and no election was required to protect this right. *See id.* Likewise, no election was needed to enable the trial court and this court to review the legal sufficiency of the evidence. *See id.* Given the State's theory and the evidence, no danger existed that the jury would return a "patchwork verdict" that was not based upon a unanimous decision of the offense for which it found the Defendant guilty. *See id.*; *Shelton*, 851 S.W.2d at 137.

The trial court did not err in declining to order the State to provide an election. The Defendant is not entitled to relief on this basis.

## IV

### Admission of Lay Opinion Evidence

The Defendant contends that the trial court erred in admitting Assistant Chief Becker's testimony that he thought the Defendant would have killed the Defendant's wife if the Defendant had not been stopped by the police. The State contends that the Defendant waived the issue by failing to state the basis for his objection and that he has not demonstrated that plain error relief is required. We conclude that the Defendant is not entitled to relief.

On redirect examination of Assistant Chief Becker, the prosecutor asked, "Do you think that through your training and experience that you are able to tell if somebody is telling you the truth or if they appear to be telling you the truth?" At a bench conference, defense counsel objected on the basis of relevance. The prosecutor proposed that he would, instead, ask whether the Defendant gave Assistant Chief Becker any reason to believe the Defendant was not telling the truth, and defense counsel objected on the basis that "it's calling for the same type of conclusion and speculation and opinion on the witness's part. It's asking him to form a conclusion about the totality of everything that was said." The trial court sustained the objection to the question as stated but ruled that Assistant Chief Becker could "testify as to his own personal opinions as to what he observed from the defendant." At the conclusion of the bench conference, the following transpired:

> Q    Did the defendant hesitate whenever he was talking to you?
>
> A    No.
>
> Q    Did he, in other words, wiffle waffle, in your opinion?
>
> A    No.
>
> Q    Did you believe that you could clearly understand what he was saying?
>
> A    Yes, I could.
>
> Q    After listening to the defendant and giving this interview, what did you think that he was going to go do?

[Defense Counsel]: Your honor, I object to that.

[Trial Court]: Overrule.

*Q        What did you think he was going to go do, if the police hadn't stopped him?*

*A        Find his wife and kill her.*

Q        You asked the question; what were your intentions tonight before the police had contact with you. Do you remember what the defendant said?

A        Yes.

Q        What did he say?

A        He said he was going to kill his wife.

Q        My intentions were to go over there and kill her?

A        Yes.

Q        What other things did he say he was going to do to his wife?

A        He was going to cut a tattoo off her arm. He described what the tattoo was. I asked him and he described it. He described that he was going to shoot her in the leg at first and then cut the tattoo off and then kill her. He was going to kill the guy if he was with her.

Q        What did he say he was going to do after killing them?

A        Well, a couple of things. One is if the police had contact with them he was going to shoot at them so it would ricochet and let the police shoot him or he was going to try to leave the country and maybe go to South America on a boat.

(Emphasis added.)

We begin with the State's argument that the Defendant waived appellate review of this issue by failing to state the basis for his objection in the trial court. The Defendant contends that Assistant Chief Becker's testimony was improper lay opinion testimony and should not have been admitted pursuant to Tennessee Rule of Evidence 701. He contends, as well, that the testimony was unfairly prejudicial and was inadmissible pursuant to Tennessee Rule of Evidence 403. The record reflects that the Defendant objected to Assistant Chief Becker's offering opinion evidence and that the court overruled the objection, after which the State elicited the testimony of which the Defendant now complains. To this extent, the issue is not waived. The record does not reflect, however, that the Defendant objected to the evidence, though relevant, as unfairly prejudicial pursuant to Rule 403. To the extent he now raises a Rule 403 issue, the issue is waived.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (*citing State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 701(a) provides:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Assistant Chief Becker's testimony was rationally based on his perception. The question of whether it was helpful to a clear understanding of his testimony or to the determination of a fact in issue is more complex. Relative to whether his opinion testimony was helpful to a clear understanding of his testimony, he testified about the Defendant's statement that the Defendant was going to kill his wife. Assistant Chief Becker stated that the Defendant was not hesitant or equivocal in the statement. The statement was played for the jury. Assistant Chief Becker's testimony about the Defendant's statement and the

Defendant's demeanor, as well as the statement itself, were straightforward, and Assistant Chief Becker's opinion as to what he thought the Defendant would have done if the Defendant had not been apprehended was not helpful to a clear understanding of Assistant Chief Becker's testimony. The jury was capable of drawing its own conclusions from the testimony and other evidence. *See Blackburn v. Murphy*, 737 S.W.2d 529, 532 (Tenn. 1987) (noting that lay opinion testimony may be admitted to describe "'observed facts in the only way in which they can be clearly described'" and may extend to such matters as whether a person was drunk, the identification of the nature or source of a sound, distance, or speed) (quoting *National Life & Accident Ins. Co. v. Follett*, 80 S.W.2d 92, 98 (Tenn. 1935)).

Nevertheless, Assistant Chief Becker's opinion testimony may have been admissible if it were relevant to the determination of a fact in issue. In that regard, a significant issue relative to whether the Defendant had taken a substantial step toward committing a premeditated killing of his wife was whether the Defendant, when he returned to Clinton from the Knoxville area at Mr. Patterson's urging, was ultimately en route to LaFollette to find and kill his wife, and had only been prevented from doing so because he was apprehended by the authorities. Our supreme court has said that the more directly opinion testimony speaks to an ultimate issue, the less likely the testimony is to be admissible. *See id.*

In *Blackburn*, a civil case involving liability from an automobile accident, the supreme court said a trial court erred in permitting a lay witness to testify that the accident could not have been avoided due to the hazardous road conditions that existed. *See id.* at 532-33. The *Blackburn* court noted, "The relevant facts were easily related and the case involved a matter of common experience about which we are fully confident that the jury could readily draw its own conclusions unaided by any opinion testimony." *Id.* at 533.

Similarly, in the present case, Assistant Chief Becker's opinion testimony that he thought the Defendant was going to kill his wife if the Defendant had not been apprehended was closely intertwined with the ultimate issue of whether the Defendant had taken a substantial step toward killing his wife. The jury had before it evidence of the Defendant's declarations of his intent to kill his wife and evidence of the Defendant's preparatory actions in procuring weapons and ammunition, secretly leaving his father's residence, stopping to change into military attire and load ammunition into clips, and traveling to Mr. Patterson's house to say goodbye. The relevant facts could be, and were, related to the jury without the need for Assistant Chief Becker's lay opinion testimony as to what the Defendant's course of action would have been if the Defendant had not been apprehended. As such, we conclude that the admission of this evidence was erroneous.

-22-

The remaining question, though, is whether the Defendant was harmed by the admission of the evidence. In that regard, we note the abundant evidence that the Defendant intended to kill his wife. The proof showed that both the Defendant's father and Mr. Patterson were so alarmed by the Defendant's statements relative to harming his wife that they contacted law enforcement. After she claimed to have no recollection of relevant events, Ms. Burchett's prior statement and testimony were admitted and reflected that the Defendant spoke of killing his wife in the days before August 26, 2011. The Defendant's pretrial statement to Assistant Chief Becker reflected that the Defendant planned to find and kill his wife. Abundant and overwhelming evidence, aside from Assistant Chief Becker's lay opinion testimony, showed that the Defendant intended to kill his wife and had undertaken substantial preparatory actions in furtherance of his intent. We conclude that the erroneous admission of Assistant Chief Becker's lay opinion testimony was harmless error. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE